IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

AKRAM VAZIRI,

    *Plaintiff*,

v.

    Civil Action No. ELH-17-1553

LEVINDALE HOSPITAL/
LIFE BRIDGE HEALTH.

    *Defendants*.

**MEMORANDUM OPINION**

Akram Vaziri, the self-represented plaintiff, filed an employment discrimination action against her former employer, "Levindale Hospital/Life Bridge Health." ECF 1 (Complaint).[1] Plaintiff alleges discrimination on the basis of her national origin (Iran); religion (Muslim); age (58 years); and disability (diabetes and her daughter's "generalized anxiety disorder"). *Id*. In particular, plaintiff claims that she was denied training, denied a preferable shift at Levindale, and ultimately terminated as a result of discrimination and in retaliation for filing a discrimination complaint. *Id*.

Suit was filed on June 6, 2017, pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §§ 2000e-2000e-17; the Age Discrimination in Employment Act of 1967 ("ADEA"), as amended, 29 U.S.C. §§ 621-634; and the Americans with Disabilities Act of 1990 ("ADA"), as amended, 42 U.S.C. §§ 12112-12117. ECF 1 at 5. Defendants moved to dismiss most of plaintiff's claims, pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6). ECF 5. By Memorandum (ECF 18) and Order of March 8, 2018 (ECF 19), I dismissed LifeBridge as a

---

[1] Levindale's full name is "Levindale Hebrew Geriatric Center and Hospital." *See* ECF 20-1, ¶ 1; *see also About Levindale – Geriatric Center in Baltimore MD*, http://www.lifebridgehealth.org/Levindale/AboutLevindale.aspx. LifeBridge Health is the parent company.

defendant and dismissed plaintiff's claims for religious discrimination, national origin discrimination, age discrimination, and disability discrimination, all without prejudice. However, I denied defendants' motion as to plaintiff's retaliation claim. I also granted plaintiff leave to file an Amended Complaint.

Plaintiff filed an Amended Complaint against Levindale and LifeBridge (ECF 20 at 1-8), with numerous exhibits (ECF 20 at 9-26; ECF 20-1).[2] The Amended Complaint largely duplicates the claims that were asserted in the initial Complaint. *See* ECF 20 at 1-8.

Thereafter, pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(6), and 56, defendants filed a "Motion to Dismiss, or, Alternatively, Motion for Summary Judgment" (ECF 24), supported by a memorandum of law (ECF 24-1) (collectively, the "Motion") and several exhibits. ECF 24-3 - ECF 24-10. They contend that the Court lacks subject matter jurisdiction in regard to Vaziri's religion and disability discrimination claims. ECF 24-1 at 19-20. And, they maintain that the Amended Complaint fails to state claims for discrimination based on national origin and age. *Id.* at 21-24. Defendants also assert that plaintiff's retaliation claim fails as a matter of law. *Id.* at 25-28.

Vaziri opposes the Motion (ECF 28, the "Opposition"), supported by twenty-four exhibits. ECF 28-2 - ECF 28-25. In her Opposition, she "remove[d]" her claims of discrimination with respect to "disability, national origin and religion." *See* ECF 28 at 1. But, she seeks to pursue her claims based on retaliation and age discrimination. *Id.* Defendants have filed a reply (ECF 36), with numerous exhibits. ECF 36-2 - ECF 36-19.

---

[2] Vaziri failed to provide a redline version of the Amended Complaint, as required by Local Rule 103.6(c).

Vaziri has also moved for leave to file a surreply. ECF 37 ("Motion for Surreply"). Defendants did not respond, and the time to do so has passed. *See* Local Rule 105.2(a).

No hearing is necessary to resolve the motions. *See* Local Rule 105.6. For the reasons that follow, the Motion for Surreply (ECF 37) shall be denied, and the Motion (ECF 24) shall be granted in part and denied in part.

## I.     Factual Background

Vaziri asserts that she is now 58 years old, and has "almost 39 years of experience as a registered Nurse", in areas such as "Medical surgical, Intensive Care Unit, Emergency Room, IV Therapy, Hemodialysis, Pediatric, Inservice Educator, College Instructor, manager and Nursing Supervisor." ECF 1 at 4, 5. On March 21, 2011, she began her employment with LifeBridge, as a Nursing Supervisor at the Levindale Hospital ("Levindale") location. ECF 20, ¶ 1.[3] According to Vaziri, during her tenure at Levindale she "was employed and paid by [L]ifeBridge [H]ealth . . . ." *Id*; *see also id*. at 8. She asserts: "Every aspect of [Levindale] was controlled by [LifeBridge]." *Id*. at 7-8.

Over the course of Vaziri's employment, "on numerous occasions [she] reported wrongdoing of some of the employees" to her supervisor, Virginia Saunders. *Id*. ¶ 2. Those employees include Rita Chikeka, a day-shift supervisor; Maria Cohen, a night-shift supervisor; and Tulasy Surrendran, a night-shift supervisor. *Id*. ¶¶ 2-3.

Plaintiff claims that Saunders "provoked" the other employees against Vaziri, as they "became nasty, and disrespectful, and non-cooperative with [Vaziri]." *Id*. ¶ 3. For example, the

---

[3] Plaintiff numbers the first five paragraphs of her Amended Complaint as 1 through 5, but then numbers the sixth paragraph as 2. *See* ECF 20 at 1-2. She also numbers two paragraphs as 4 and 5 on page 5 of ECF 20. She does not number the other paragraphs.

employees would talk in their native languages "about [her] and make[] fun of [her] daughter's sickness." *Id.* ¶ 4. Vaziri says that she "felt isolated and lonely because of their behaviors." *Id.*

Vaziri reported "the issue" with Saunders to Candace Hamner, Vice President and Chief Nursing Officer of Levindale, as well as to John Robison, the Administrator of Levindale. *Id.* ¶ 5. In an email to Hammer of June 30, 2014 (ECF 28-4), Vaziri stated, in relevant part, *id.* at 2:

> . . . Staff do not listen to me because I report to [Saunders] that is the way of her reaction toward me. she put me down in front of others trough [sic] the E mail. How she is expecting staff to follow me when there is no support from her.
> I do not know what I did wrong that she thinks I deserve to be treated like this?
> I am a RN with 35 years of experience in different units and different specialty [sic]. whatever I apply for any position, she do[es] not offer me the position but they offer it [to] Rita or [an]other person that their qualification and experience is less than me.

Vaziri also asserts that her twelve-year-old daughter suffers from "generalized anxiety disorder," and that she requested a day shift position so that she could be home with her daughter at night. ECF 20 at 2. Vaziri complains that Saunders denied this request and "preferred to choose younger, less experience[d] employees." *Id.* Those employees included Irene Burk, "an interim unit manager" who "later became [a] permanent unit manager" but initially had no "Manager or Supervisory experience"; Maria Cohen, a "Unit Manager"; Vashtie Archer, a "newly graduated" nurse with no nursing or supervisory experience, who "was hired for [a] day shift supervisory position"; and Crystal Henry, "who was young and [had] no supervisory experience" but "was hired for [a] day shift supervisor position." *Id.* at 2-3.

According to Vaziri, a "day shift Nursing Supervisor" requires "less qualifications compared to [the] night shift." *Id.* at 4. As a result, she "did not understand which qualification [she] was lacking, compared to those young[er] employees who were chosen for day shift positions." *Id.* During her tenure at Levindale, Vaziri claims that "there was no any [sic] evidence

or incident report against [her]." *Id*. She avers: "Nothing wrong happened to any residents or patients during my duty." *Id*. at 3.

On an unspecified date in 2015, Vaziri switched shifts with Ebinizer Akintola, a day shift supervisor. *Id*. at 4. During a morning meeting that day, Vaziri alleges that Saunders and Michelle Preston, the Director of Nursing at Levindale, "were very mean to [her] and did not look in [her] eyes even one time, did not talk or communicate" with her, but "were very nice to other people and staff." *Id*. "Their behavior made [her] very sad," and she "went to the supervisor's office and . . . cried." *Id*.

Vaziri then "reported this behavior" to Human Resources Director Gina Dembeck. *Id*. In an email to Dembeck on July 29, 2015, Vaziri wrote, ECF 28-17:

> As I talked to you I feel that I have been discriminated , As you know I have family health problem that puts my daughter in a dangerous position.
> I have been talking to you, Michelle, Gloria, and [G]inger[4] for a long time and I was applying constantly for different day positions. which [sic] none was offered to me

In an email of September 4, 2015 (ECF 28-6) to Idriz Limaj, the Chief Operating Officer of LifeBridge, Vaziri wrote, in pertinent part:

> I have been talking, sending E-mail to my Managers (Ginger Saunders and Michelle Preston) and Human resources over and over and applying for day shift positions all over the place.
> After 37 years working as a RN in too many different specialty units, as Nursing supervisor in [L]evindale almost 5 years, and nine years management and supervisory experience. they are telling me that I am not qualified even for a position that I am already in.
>             \*       \*       \*
> I have to add that more than a year ago I reported some staff poor performances to Ms. Ginger.
> Ms. Ginger did not handle the issue properly and she let the same staff to confronted [sic] me and created bad condition for me which made me frustrated. I reported the issue to Mr. John Robison, the administrator and Ms. Hamner. Since then MS. [sic]

---

[4] Vaziri mistakenly refers to Virginia Saunders as "Ginger Saunders."

Ginger did not approve me for any position which I applied. Apparently she have influence . . . Ms. Preston who is not considering me for any position either.

In August 2015, Preston conducted Vaziri's "annual performance appraisal" (ECF 24-5, "2015 Appraisal"), "which was shared with [Vaziri] on September 4, 2015." ECF 24-3 ("Preston Affidavit"), ¶ 6. "Vaziri received an overall ranking of 'Needs Improvement,' the lowest possible ranking." *Id.* "Among the more significant performance deficiencies" that Preston identified were Vaziri's "unfamiliarity with documenting and implementing patient care." *Id.* ¶ 7.

Additionally, Preston "had concerns about . . . Vaziri's professionalism." *Id.* ¶ 8. Preston explained: "Akram at times can be viewed as unapproachable to staff and peers. It is important to learn to take constructive feedback without getting defensive. It is also important to learn to actively listen to others to be able to appreciate their view point. Akram would benefit from taking a leadership class pertaining to positive communication." ECF 24-5 at 2. Further, Preston observed, *id.* at 3: "There is a lack of trust and teamwork with Akram and her peers. She also struggles with positive communication, actively listening and taking ownership of the situation."

Preston concluded, *id.* at 9:

> Akram does a good job rounding on staff and patients and providing feedback to the managers. She takes the time to educate team members when there is something that they do not know. Akram could improve on her ability to take constructive feedback without getting upset and defensive. It would be beneficial to Akram to see the supervisors as a team rather than individually. I would like to see Akram improve on her ability to work within a group that is diverse and being able to appreciate this diversity. Akram has a hard time seeing the good of the entire group rather than her individual needs. . . .

Vaziri responded to the 2015 Appraisal on September 4, 2015, stating, in part: "I [k]now that I am not perfect but I will listen to critisem [sic] and will do my best to grow. . . . I need to get a day shift position to match my family need that I feel stress and be able to bring out my best for patients and who I work with them." *Id.* at 11. Also on September 4, 2015, Vaziri electronically

signed the Appraisal, acknowledging that she had read the review and discussed it with her supervisor, Preston.  *Id*.

On October 23, 2015, as a result of Vaziri's "needs improvement" rating, Vaziri was placed on a Performance Improvement Plan ("PIP").  ECF 24-3, ¶¶ 12-13; ECF 24-6 (PIP).  In a meeting that same day, Preston, Vaziri, and Human Resources Business Partner Gina Dembeck discussed the PIP, and each signed and dated each page of the plan.  ECF 24-6 at 1-4.  The PIP explains, in relevant part, *id*. at 1:

> This plan is an opportunity for the employee to make improvements to be able to fully meet the duties and responsibilities of the job.  Immediate and sustained improvement is expected and failure to do so may result in further disciplinary action, up to and including termination of employment.

The PIP also describes particular areas in which Vaziri was regarded as deficient in her performance and for which she needed improvement.  *Id*. at 1-3.  It provides, *id*. at 1-2:

> Lack of proactive presence on the units, staff does not perceive Akram as a resource or an advisor for them.
>
> Lack of service as an internal expert resource. Akram herself stated that she does not have the ability to perform as a bedside nurse.
>
> The staff perceives that Akram is not able to navigate the [Electronic Medical Record ("EMR")] to be able to assist the staff in such. . . .
>
> Argumentative with other supervisors.
>
> At times, displays an accusatory tone. . . .
>
> Limited understanding of directions and guidance without repeated attempts of communication.

Under the PIP, Preston instructed Vaziri to email Carol Forrest, Manager of the High Intensity Care Unit ("HICU"), to schedule dates on which she would work in the HICU "to increase her comfort level with critical patients," ECF 24-3, ¶ 14; to attend a leadership class on "Effective Communication or Connecting with Others," prior to November 30, 2015, *id*. ¶ 15; to

speak directly with a co-worker about any disagreement, *id*.; and to send Preston an email prior to October 26, 2015, with her availability for progress report meetings. *Id*. In addition, Preston directed Vaziri to meet with Rebecca Shafer, the Clinical Resource Nurse, or attend a "Cerner Navigation" training prior to November 1, 2015. *Id*. Cerner is the "[EMR] database that Levindale began using in February 2015." *Id*. ¶ 7.

In an email to Preston and Dembeck on November 6, 2015 (ECF 28-13), Vaziri stated that she signed the PIP "because [she] felt pressure from [Preston] and Ms. Gina Dembeck." *Id*. at 1. Further, she stated that her signature "d[id] not mean that [she] agreed with [Preston] on what you [all] are accusing me of." *Id*.

Moreover, Vaziri claims she was placed on the PIP "without any clear explanation." ECF 20 at 5. She alleges that the PIP "was not clear and the deadline was not realistic and not coordinated based on [her] schedule." *Id*. Further, Preston, who "was new in her position" as Director of Nursing, "did not have any chance to directly observe [Vaziri] or work with [Vaziri]," and "[Preston's] evaluation was based on hearsay, not actual facts and evidence." *Id*. at 6. Moreover, Preston "did not come up with evidence and date[s] and incident reports or any visual observation of [Vaziri's] performance," *id*., and "questions that [Vaziri] asked [Preston] were not answered properly." *Id*. at 5.

On November 4, 2015, Preston discussed with Vaziri "her lack of progress on many of the PIP tasks and sent her an e-mail following [the] conversation." ECF 24-3, ¶ 17. Although Vaziri had completed a leadership class, "at least three other significant goals had not been met." *Id*. In an email of the same date (ECF 24-7), Preston explained to Vaziri, in relevant part, *id*.:

> [Y]ou were suppose[d] to email Carol Forrest with dates 4 hours each week that you were able to come to the HICU to do share time. This was suppose[d] to be sent out by Monday October 26, 2015, but has yet to be sent to her. . . .

You were also suppose[d] to email with times that you are able to meet once a week to go over the progress of your PIP by October 26, 2015, but I have not received meeting dates from you. This is the second week of your PIP and I have not met with you.

In the email, Preston recognized that plaintiff had "been going back and forth with times and dates" in regard to Cerner Navigation. *Id.* And, she noted that plaintiff had completed the leadership class. *Id.* Nevertheless, Preston warned Vaziri, *id.*:

I want to reiterate our conversation when reviewing the PIP. Remember that this action plan was put in place to assist you with being successful as a leader in our organization. It is extremely important that you complete the tasks above in a timely manner. Failure to complete them may result in termination . . . .

Despite Preston's warning, "Vaziri waited until November 8, 2015 – almost two weeks after [the] agreed-upon deadline – to send the e-mail to Carol Forrest." ECF 24-3, ¶ 18. And, Vaziri failed to send the email Preston requested with proposed dates on which they would "meet to track [Vaziri's] progress with the PIP tasks." *Id.*

Also, in an email to Preston on November 10, 2015 (ECF 24-8), Shaffer stated that she had met with Vaziri for approximately 45 minutes that same day to review Cerner Navigation. Shaffer explained, in pertinent part, *id.*:

[Vaziri] originally contacted me in late October, as she wanted me to refresh her with Cerner navigation. However, when I met with her, she stated that she had not signed into Cerner since go-live in February, 2015. She mentioned that she never had to log into Cerner as a Supervisor and therefore, had not logged on since the Cerner training for Levindale employees in February, 2015. Since this was the case, this was not a refresher; rather, a complete Cerner training, as I had to walk her through all aspects of the Cerner navigation.

Shaffer's "statements concerned [Preston] greatly." ECF 24-3, ¶ 19. According to Preston, since February 2015, "all Levindale nurses relied on the Cerner navigation module on a daily basis to administer patient care . . . and Ms. Vaziri's lack of basic fluency and inability to provide

guidance with such essential matters both rendered her ineffective as a Nursing Supervisor and threatened to harm the quality of our patient care at Levindale." *Id*.

Vaziri complains that the PIP deadlines were "impossible" to meet "with [her] schedule." ECF 20 at 6. Under the PIP, she was required to "work full time as [a] night supervisor," and "at the same time take management classes, attend the supervisor meetings and in-services, having meeting[s] with [Preston] about [Vaziri's] progress, [attend] class with Rebecca Shefer, work [a] day shift at HICU as a bedside nurse . . . , learn leadership skills, and learn How [sic] to become a good resource nurse . . . ." *Id*. Plaintiff also alleges that Cohen "took revenge from [Vaziri] by messing up [her] assignments, which made [her] unable to meet the deadline for PIP." *Id*. ¶ 4. Moreover, because plaintiff "was not given to access" to Cerner, she claims that she "did not have [the] chance to practice." *Id*. at 7. She alleges that, until the day of her termination, "Preston ignored [her] request for access to this program . . . ." *Id*. And, she maintains that Cohen "was playing" with plaintiff's schedule "to accommodate the needs of her friends . . . ." *Id*. at 6.

Further, Vaziri notes that she was "the only Iranian moslem, Nurse at Levindale . . . ." *Id*. at 5. In her words, "everyday media relates the Iranian Muslim critics or Iran to terrorist[s]" and "it makes some people believe that every Iranian Muslim are Terrorist . . . ." *Id*.

On October 27, 2015, plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC"). ECF 20 at 26, ¶ 6. She attached a copy of the EEOC Charge as an exhibit to the initial Complaint (ECF 1-1 at 2, "Charge"), along with the EEOC's Dismissal and Notice of Rights, which was issued on March 9, 2017. *Id*. at 1.[5] The Charge named both Levindale and LifeBridge. *Id*. Vaziri checked boxes on the Charge form indicating that she was discriminated

---

[5] The Court may consider exhibits attached to the original complaint if integral to the amended complaint and incorporated there. *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

against on the basis of national origin, and that she suffered retaliation. *Id.* at 2. She did not check the boxes for discrimination based on age, religion, or disability. *Id.* In her description of the claims, however, Vaziri stated that she had "not been selected for a day shift position while younger, less experienced employees have been given day shift positions." *Id.* She also stated: "I am the only Iranian nurse in the hospital's employ and I have complained of being discriminated against on more than one occasion, most recently October 22, 2015. On October 23, 2015 I was placed on a Performance Improvement Plan." *Id.* Further, she stated that she was discriminated against because of her "national origin" and was subjected to retaliation. *Id.*

Plaintiff entered her date of birth in the corresponding box on the Charge form, indicating that she was born in 1956. ECF 1-1 at 2. Therefore, Vaziri was over 40 years of age at the time she filed the Charge.

Defendants claim that, due to "Vaziri's substantial shortcomings in addressing several performance issues raised in her PIP, Preston "recommended that Ms. Vaziri's employment be terminated." ECF 24-3, ¶ 20. Plaintiff was terminated on November 11, 2015, with the approval of Dembeck; Dembeck's supervisor, Amy Ward; and Robison. *Id*; *see also* ECF 24-10 ("Dembeck Affidavit"). Both Preston and Dembeck maintain that, at the time they decided to terminate Vaziri, they were not aware that she had filed a Charge of Discrimination with the EEOC on October 27, 2015. ECF 24-3, ¶ 22; ECF 24-10, ¶ 10.

In a meeting with Preston, Robison, and Ward on November 11, 2015, Vaziri was informed of her termination. ECF 24-3, ¶ 20. Following the meeting, Vaziri claims that she "was escorted out by a security officer" and "treated . . . like a terrorist[]." ECF 20 at 4. According to Vaziri, she was not given a "chance to collect [her] belongings or say goodbye to [her] coworkers" and

she "was humiliated in front of [her] coworkers." *Id*. Upon termination, she was "disqualified to apply for any other LifeBridge Health Hospitals or facilities." *Id*. ¶ 1.

Following Vaziri's termination, Preston updated Vaziri's PIP (ECF 24-9, "Updated PIP") to reflect the reasons for her termination. *See also* ECF 24-3, ¶ 21. Preston wrote, in relevant part, ECF 24-9 at 4:

> On September 4, 2015 Akram received her annual performance evaluation with an overall rating of needs improvement. After this review meeting it was discussed that Akram would send an email in regards to her feedback on her evaluation, which she did on 9/13/15. On 9/29/15 myself and HR met with Akram to discuss her concerns with the evaluation and to explain to her that since she received an overall rating of needs improvement that she would be placed on a Performance Improvement Plan (PIP). After careful evaluation of her 2014 and 2015 evaluations and speaking to Akram on what she feels her opportunities were, the PIP was Issued on 10/23/15. Expectations were clearly set during this meeting and Akram has not met the requirements of the Performance Improvement Plan that was laid out with specified time frames for completion. It was explained to Akram that the purpose of the PIP was to assist her in the areas that were opportunities to allow her growth, knowledge and aid in her success.

Preston then listed the specific expectations that Vaziri did not meet, as required under the PIP. *Id*.

The "Employee Comments" section of the Updated PIP reads: "Michelle Preston . . . is completing this section for employee as employee has been terminated. Termination occurred by John Robison and Amy Ward on 11/11/15." *Id*. at 5. The section also includes Vaziri's electronic signature, dated November 19, 2015. *Id*. However, Vaziri claims that Preston forged her signature. ECF 28 at 5.

In response to the Charge, on January 1, 2016, Levindale submitted its "Statement of Position" to the EEOC. ECF 28-5 at 2-4. It provides, *inter alia*, that in Vaziri's annual appraisal of 2013, Vaziri "was rated as an "Unsatisfactory Contributor, the lowest possible rating." *Id*. at 2. In her 2014 review, she "was rated as an 'Accomplished,' which is the same as a Full Contributor"

and "is the rating given to the majority of employees who are performing their job satisfactorily." *Id.* at 3. In 2015, as noted, Vaziri received a "Needs Improvement" rating." *Id.*

This suit followed on June 6, 2017. ECF 1.

On her civil complaint form, plaintiff checked boxes indicating that the discriminatory conduct of which she complained included her termination, defendant's failure to promote her, and retaliation. *Id.* at 6. She checked a box indicating that the defendants "are still committing these acts," although she did not explain the basis for her assertion. *Id.* Plaintiff also checked boxes indicating that defendants discriminated against her on the basis of her religion, national origin, age, and disability. *Id.*

Additional facts are included in the Discussion.

## II.     Motion for Surreply

Vaziri moves for leave to file a surreply based on "discrepancies" she found "in defendants['] exhibits and documents." ECF 37 at 1. She explains: "Because [the] Nursing profession is also controlled by the Board of Nursing and [the] Nurse Practice Act[,] the contents of defendant's exhibit[s] and documents need[] to be examined based on [the] Nurse practice act regulations and requirements." *Id.* at 1-2.

Vaziri appears to refer to the Maryland Board of Nursing, *see* Md. Code (2014 Repl. Vol., 2018 Supp.), §§ 8-201 *et seq.* of the Health Occupations Article ("H.O."), and the Maryland Nurse Practice Act ("NPA"), H.O. §§ 8-801 *et seq.* The Maryland Board of Nursing is a State entity that, among other things, "set[s] standards for the practice of registered nursing" and "adopt[s] rules and regulations for the performance of . . . nursing acts[.]" H.O. § 8-205. The NPA sets forth, *inter alia*, license requirements for registered nurses, H.O. § 8-301; grounds for license denial, suspension, or revocation, H.O. § 8-316; and approved practical nursing programs, H.O. § 401.

Local Rule 105.2(a) provides that a party is not permitted to file a surreply without permission of the court. Although the filing of a surreply "is within the Court's discretion, *see* Local Rule 105.2(a), . . . they are generally disfavored." *EEOC v. Freeman*, 961 F. Supp. 2d 783, 801 (D. Md. 2013), *aff'd in part*, 778 F.3d 463 (4th Cir. 2015); *see also, e.g.*, *Chubb & Son v. C & C Complete Servs., LLC,* 919 F. Supp. 2d 666, 679 (D. Md. 2013). However, a surreply may be permitted when the party seeking to file the surreply "would be unable to contest matters presented to the court for the first time" in the opposing party's reply. *Clear Channel Outdoor, Inc. v. Mayor & City Council of Baltimore*, 22 F. Supp. 3d 519, 529 (D. Md. 2014) (quotations and citations omitted). Conversely, a surreply is generally not permitted where the reply is merely responsive to an issue raised in the opposition. *See Khoury v. Meserve*, 268 F. Supp. 2d 600, 605-06 (D. Md. 2003).

Vaziri requests leave to file a surreply to address "discrepancies" in defendants' exhibits based on the NPA. ECF 37 at 1. She does not identify which exhibits contain the purported discrepancies. Nor does she include which section of the NPA she is referencing.

In my view, a surreply is not warranted. Plaintiff does not assert that defendants raised new issues for the first time in their Reply. And, defendants did not raise any issues in their Reply that were not responsive to plaintiff's Opposition. *See Khoury*, 268 F. Supp. 2d at 605-06. As such, plaintiff's Motion for Surreply is denied.

### III.    Legal Standards

The Court is mindful that pleadings filed by a pro se litigant are liberally construed and, "'however inartfully pleaded, must be held to less stringent standard than formal pleadings drafted by lawyers.'" *Erickson v. Pandus*, 551 U.S. 89, 94 (2007) (citation omitted). *See also* Fed. R. Civ. P. 8(f) ("All pleadings shall be so construed as to do substantial justice"); *see also Haines v.*

*Kerner*, 404 U.S. 519, 520 (1972) (stating that claims of self-represented litigants are held "to less stringent standards than formal pleadings drafted by lawyers"); *Bala v. Commonwealth of Va. Dep't of Conservation & Recreation*, 532 F. App'x 332, 334 (4th Cir. 2013) (same).

Defendants' Motion is styled as a "Motion to Dismiss Or Alternatively, Motion for Summary Judgment." They cite Fed. R. Civ. P. 12(b)(1), 12(b)(6) and P.56.[6] A motion styled in the alternative implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dep't, Inc. v. Montgomery Cty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).

Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). But, when the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).[7]

---

[6] As noted, plaintiff has withdrawn her claims of discrimination based on disability, national origin, and religion. ECF 28 at 1. Therefore, Rule 12(b)(1) is not implicated. *See Staudner v. Robinson Aviation, Inc.*, 910 F.3d 141, 145 (4th Cir. 2018).

[7] In contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so. *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5 C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366 (3d ed. 2018). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id.* In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.*

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours and Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2011). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). To raise adequately the issue that discovery is needed, the nonmovant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).

To justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to the [the] opposition.'"

---

summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials.").

*Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted). A nonmoving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see McClure v. Ports*, ___ F.3d ___, 2019 WL 350375, at *6 (4th Cir. Jan. 29, 2019); *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014); *Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 Fed. Appx. 274 (4th Cir. 2008) (per curiam), *cert. denied*, 555 U.S. 885 (2008).

If a nonmoving party believes that further discovery is necessary before consideration of summary judgment, the party who fails to file a Rule 56(d) affidavit does so at his peril, because "'the failure to file an affidavit…is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Harrods*, 302 F.3d at 244 (citations omitted). But, the non-moving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature. "This is especially true where, as here, the non-moving party is proceeding pro se."

Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Id.* (internal citations omitted). According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's

objections before the district court 'served as the functional equivalent of an affidavit.'" *Id.* at 244-45 (internal citations omitted).

Vaziri, who is pro se, has not filed an Affidavit under Rule 56(d). However, in her Opposition, plaintiff maintains that, at the time of her termination on November 11, 2015, Preston and Dembeck knew that she had filed the EEOC Charge on October 27, 2015. *See* ECF 28 7-8. This directly contradicts the defense claim that the employer was unaware of the EEOC Charge at the relevant time. Plaintiff also alleges that defendants knew she had filed complaints at the hospital, and suggests that this led to the PIP.

Of import here, the judge's "function" in reviewing a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *accord Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, in considering a summary judgment motion, the court may not make credibility determinations. *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Moreover, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).

Moreover, the Fourth Circuit has said, "Ruling on a summary judgment motion before discovery 'forces the non-moving party into a fencing match without a sword or mask.'" *Putney v. Likin*, 656 F. App'x 632, 639 (4th Cir. 2016) (quoting *McCray v. Md. Dep't of Transp., Md. Transit Admin.*, 741 F.3d 480, 483 (4th Cir. 2014)). This is especially true where, as here, the

nonmoving party is proceeding pro se and "the information requested is in the sole possession of the moving party[.]"  *Putney*, 656 F. App'x at 638.

I shall address the Motion under principles of summary judgment, however, because it relies on matters outside the pleadings.

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Iraq Middle Mkt. Dev. Found. v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017) ("A court can grant summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law.").  The nonmoving party must demonstrate that there are disputes of material fact so as to preclude the award of summary judgment as a matter of law.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86.

 The Supreme Court has clarified that not every factual dispute will defeat the motion.  "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson*, 477 U.S. at 247-48 (emphasis in original).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Id.* at 248.  There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*; *see also Sharif v. United Airlines, Inc.*, 841 F.3d 199, 204 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004); *see also Celotex*, 477 U.S. at 322-24. Moreover, in resolving a summary judgment motion, a court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. Ltd.*, 475 U.S. at 587; *accord Roland v. United States Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013). However, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. But, "the mere existence of a scintilla of evidence in support of the [movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [movant]." *Id.*

## IV.    Discussion

### A.

Defendants contend that the Court lacks subject matter jurisdiction as to Vaziri's religious and disability discrimination claims, for failure to exhaust.[8]   In addition, they assert that plaintiff has failed to state viable claims of national original and age discrimination, and that her retaliation claim fails as a matter of law. *See* ECF 24-1.[9]

---

[8] *But see Stewart v. Iancu*, 912 F.3d 693, 701 (4th Cir. 2019 (concluding that Title VII's 180-day waiting period is not a jurisdictional requirement but rather a "'prudential prerequisite to suit'") (citation omitted); *Staudner*, 910 F.3 at 148 (stating that the exhaustion requirement under the Labor Management Relations Act, 29 U.S.C. § 185(a), "is a nonjurisdictional precondition to suit rather than a jurisdictional limit.[]").

[9] Notably, defendants do not contend that LifeBridge should be dismissed as a defendant. However, defendants "do not concede that LifeBridge Health is a proper party in this case." ECF

In her Opposition, Vaziri withdraws her claims of discrimination "regarding[] disability, national origin and religion." She states, referring to the Memorandum Opinion and Order of March 8, 2018 (ECF 18): "I respectfully accept the judge['s] decision and remove my allegation for those discriminations." ECF 28 at 1.

Accordingly, those claims are no longer pending. Plaintiff's claims remain as to age discrimination under the ADEA and retaliation under Title VII.

## B.      Methods of Proof

Where, as here, a plaintiff has alleged that an employer terminated her on a discriminatory basis, the plaintiff bears the burden of proving her claim by a preponderance of the evidence. In general, there are "two avenues" by which a plaintiff may prove intentional employment discrimination *at trial*. These two avenues inform a court's evaluation of the evidence at the motions stage. *Thomas v. Delmarva Power & Light Co.*, 715 F. App'x 301, 302 (4th Cir. 2018) (per curiam) (citing *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004) (en banc), *abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013)).

The first avenue of proof is to offer "'direct or indirect'" evidence of discrimination, under "'ordinary principles of proof.'" *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996) (citation omitted), *cert. denied*, 520 U.S. 1116 (1997). The second avenue available to the plaintiff is to follow the burden-shifting approach first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016) (discussing the three steps of the *McDonnell Douglas* framework).[10]

---

24-1 at 12 n. 2. In their words, that "dispute is immaterial . . . because Vaziri has failed to state an actionable discrimination and/or retaliation claim against any entity[.]" *Id.*

[10] *McDonnell Douglas* involved a claim of racial discrimination in hiring under Title VII.

Notably, "the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985).

"To avoid summary judgment" when proceeding under ordinary principles of proof, "'the plaintiff must produce direct evidence of a stated purpose to discriminate and/or [indirect] evidence of sufficient probative force to reflect a genuine issue of material fact.'" *Rhoads v. FDIC*, 257 F.3d 373, 391 (4th Cir. 2001) (internal citations and quotation marks omitted; alteration in original). In *Warch v. Ohio Casualty Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006), the Fourth Circuit explained the showing that is required to withstand summary judgment via ordinary principles of proof:

> Direct evidence must be "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Taylor v. Virginia Union Univ.*, 193 F.3d 219, 232 (4th Cir. 1999) (en banc) (citation and internal quotation marks omitted). Even if there is a statement that reflects a discriminatory attitude, it must have a nexus with the adverse employment action.

In this case, plaintiff has not alleged direct or indirect evidence of discrimination. Accordingly, the focus shifts to the *McDonnell Douglas* approach.

The *McDonnell Douglas* approach establishes three stages at which the burden of evidentiary production is shifted back and forth between the plaintiff and defendant. However, under the *McDonnell Douglas* approach, the "ultimate burden of persuasion . . . never 'shifts' from

---

However, the burden-shifting methodology it endorsed has been adapted for use in cases of alleged discrimination in other statutory contexts. *See, e.g.*, *Raytheon Co. v. Hernandez*, 540 U.S. 44, 50-52 & n.3 (2003) (applying *McDonnell Douglas* framework in ADA employment discrimination case); *Laber v. Harvey*, 438 F.3d 404, 430 (4th Cir. 2006) (en banc) (applying *McDonnell Douglas* framework to employee's claim of age discrimination under ADEA). *But see Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 n.2 (2009) (observing that the Supreme Court "has not definitively decided whether the evidentiary framework of *McDonnell Douglas* . . . is appropriate in the ADEA context").

the plaintiff" to prove intentional unlawful discrimination. *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 n.2 (4th Cir. 1989) (citation omitted).

If the plaintiff chooses to proceed at trial under the *McDonnell Douglas* approach, the plaintiff must first establish a "prima facie case of discrimination." *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010).

To establish a prima facie claim of retaliation under Title VII, "a plaintiff must show that (1) that the plaintiff engaged in a protected activity, such as filing a complaint with the EEOC"; (2) the employer took an adverse action against the plaintiff; and (3) "'the protected activity was causally connected to the employer's adverse action.'" *Okoli v. City of Balto.*, 648 F.3d 216, 223 (4th Cir. 2011) (citation omitted). *See Strothers v. City of Laurel, Md.*, 895 F.3d 317, 327 (4th Cir. 2018); *Smyth-Riding v. Sci. Eng'g Servs., LLC*, 699 F. App'x 146, 151 (4th Cir. 2017); *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405-06 (4th Cir. 2005).

To assert a prima facie claim of employment discrimination under the ADEA, a plaintiff must allege: "(1) [s]he is a member of a protected class—that is, 40 years or older; (2) [s]he suffered an adverse employment action; (3) [s]he was performing [her] job duties at a level that met [her] employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or [s]he was replaced by a substantially younger person." *Bodkin v. Town of Strasburg*, 386 F. App'x 411, 413-14 (4th Cir. 2010) (per curiam) (citations omitted) (alterations in *Bodkin*); *see also* 29 U.S.C. § 623(a).

Under the *McDonnell Douglas* approach, if a plaintiff establishes a prima facie case of unlawful discrimination, "a presumption of illegal discrimination arises, and the burden of production shifts to the employer" to produce evidence of a legitimate, non-discriminatory reason for its adverse action. *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011). And, "[i]f

the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981). In that circumstance, "the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant," and "simply drops out of the picture." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510-11 (1993).

If the defendant meets its burden of production, the plaintiff must then prove, by a preponderance of evidence, "that the proffered reason was not the true reason for the employment decision," and that the plaintiff "has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256. *See also Adams v. Trs. of Univ. of N. Carolina-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) ("[I]n demonstrating the Defendants' decision was pretext, [Plaintiff] had to prove '*both* that the reason was false, *and* that discrimination was the real reason.'") (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)) (emphasis in original).

On the other hand, if the defendant fails to meet the burden of producing "evidence which, *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action," and the plaintiff has proved a prima facie case, "the court must award judgment to the plaintiff as a matter of law." *St. Mary's Honor Ctr.*, 509 U.S. at 509 (emphasis in original). This is because a legal presumption of intentional discrimination has been established. *Id.* at 510 n.3. *See Burdine*, 450 U.S. at 255 n.8 ("[T]he allocation of burdens and the creation of a presumption by the establishment of a prima facie case is intended progressively to sharpen the inquiry into the elusive factual question of intentional discrimination.").

### C.    Age Discrimination

Congress enacted the ADEA in 1967 "'to promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; [and] to help

employers and workers find ways of meeting problems arising from the impact of age on employment.'" *EEOC v. Balt. Cty.*, 904 F.3d 330, 333-34 (4th Cir. 2018) (quoting 29 U.S.C. § 621(b)) (alteration in *EEOC*). The statute makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1); *see Hartman v. Univ. of Md. at Balt.,* 595 F. App'x 179, 181 (4th Cir. 2014) (per curiam); *Jones v. Calvert Grp., Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009). The ADEA's protections are "limited to individuals who are at least 40 years of age." 29 U.S.C. § 631(a). Plaintiff, who was born in 1956, was within the ADEA's protection at all relevant times.

As noted, to establish a claim of employment discrimination under the ADEA, a plaintiff must allege: "(1) [s]he is a member of a protected class—that is, 40 years or older; (2) [s]he suffered an adverse employment action; (3) [s]he was performing [her] job duties at a level that met [her] employer's legitimate expectations at the time of the adverse employment action; and (4) the position remained open or [s]he was replaced by a substantially younger person." *Bodkin*, 386 F. App'x at 413-14 (citations omitted) (alterations in *Bodkin*); *see also* 29 U.S.C. § 623(a).

The Supreme Court has ruled that, unlike Title VII, the ADEA does not permit "a mixed-motives age discrimination claim." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 (2009). Rather, given that ADEA liability hinges on discrimination "*because of* . . . age," 29 U.S.C. § 623(a)(1) (emphasis added), the plaintiff must "establish that age was the 'but-for' cause of the employer's adverse action." *Gross*, 557 U.S. at 177; *see also Hartman*, 595 F. App'x at 181 (citing *Nassar*, 570 U.S. at 343).

Defendants do not dispute that plaintiff satisfies the first two elements of her prima facie case: Vaziri was over 40 years of age at all relevant times, and she suffered an adverse employment

action, *i.e.*, she was not hired for or promoted to a day shift position. *See* ECF 24-1 at 22-23. She was also terminated. Nevertheless, defendants contend that Vaziri "has failed to state sufficient facts to show that (1) she was meeting her employer's legitimate expectations when she failed to receive the day shift positions to which she applied and (2) her age was the 'but-for' cause of her not being selected." ECF 36 at 3; *see* also ECF 24-1 at 23. Defendants add, ECF 36 at 5: "Vaziri has not pleaded sufficient facts . . . to show that she was the better qualified candidate for any position."

In her Amended Complaint, plaintiff alleges that there were three positions to which she applied but for which she was not selected because of her age: (1) a unit manager position given to Maria Cohen; (2) a day shift supervisor position given to Crystal Henry; and (3) a day shift supervisor position given to Vashti Archer. ECF 20 at 2-3.

In her Opposition, plaintiff asserts that on July 24, 2015, she submitted her application for a day shift position and emailed Preston to confirm the submission. *See* ECF 28-8. However, Preston offered the position to "Ms. Crystal. Henrick [sic]" and "another day shift position was offered Ms. Vashti Archer[.]" ECF 28 at 3.[11] And, when Vaziri applied for a unit manager position, Preston gave the position to Maria Cohen, who was also a night shift supervisor in the same department, had no management experience, and was "younger than [Vaziri]." *Id.* According to plaintiff, at the time, Preston had "never mentioned [her] performance as a problem" and her "performance was full contributor before [Preston] evaluate[d] [her] as needs improvement on September 4,2015." *Id.*[12]

_____

[11] The Opposition misidentifies Crystal Henry as "Ms. Crystal. Henrick." *See* ECF 36 at 5 n. 2.

[12] Defendants urge the Court to "disregard the new allegations Vaziri lobs about other employees (Maria Cohen, Vashti Archer, and Crystal Henry) on page 3 of her opposition" and to "dismiss her age discrimination claim." ECF 36 at 3-4 (citing *S. Walk at Broadlands Homeowner's*

To be sure, "unsupported speculation" cannot establish a discrimination claim. *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996); *see Duffy v. Belk, Inc.*, 477 F. App'x 91, 94-98 (4th Cir. 2012) (ADEA case). Once a plaintiff bases her allegations upon a comparison to an employee from a non-protected class, she must demonstrate that the comparator was "similarly situated" in all relevant aspects. *Sawyers v. United Parcel Serv.*, 946 F. Supp. 2d 432, 442 n. 10 (D. Md. 2013), *aff'd*, 576 F. App'x 199 (4th Cir. 2014). "Such a showing would include evidence that the employees 'dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). Moreover, as defendants point out, Maria Cohen was not selected for the position in issue, "which was filled by a different applicant on or about May 15, 2013." ECF 36 at 5 (citing ECF 36-2, ¶ 7; ECF 36-5) (showing that the position was filled on May 15, 2013).

Defendants also maintain that Vaziri "cannot base her ADEA claim on a comparison to Maria Cohen because any such claim is time-barred." ECF 36 at 5. Cohen applied for the same position as Vaziri on February 21, 2013—more than two years before Vaziri filed her EEOC Charge on October 27, 2015, and well past the filing deadline. *Id.*; *see also* ECF 36-2 ("Powell Affidavit"), ¶¶ 5-6; ECF 36-3 ("Cohen Application"); ECF 36-4 ("Cohen Application History").

Under both Title VII and the ADEA, an aggrieved person must file a "charge" of discrimination with the EEOC or an appropriate state or local agency within 180 days of "the

---

*Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013) ("It is well-established that parties cannot amend their complaints through briefing or oral advocacy.")).

alleged unlawful employment practice occurred," as a prerequisite to filing suit in court. 42 U.S.C. § 2000e-5(e)(1) (Title VII); *see* 29 U.S.C. § 626(d)(1) (ADEA provision requiring filing of "charge" with EEOC within specified time "after the alleged unlawful practice occurred"); *Edelman v. Lynchburg Coll.*, 300 F.3d 400, 404 at n.3 (4th Cir. 2002). However, in a "deferral" jurisdiction, the period is extended to 300 days. *Id.* Maryland is a deferral state under both Title VII and the ADEA. *Garnes v. Maryland*, RDB-17-1430, 2018 WL 276425, at *4, n.8 (D. Md. Jan. 3, 2018); *see Prelich v. Med. Resources, Inc.*, 813 F. Supp. 2d 654, 661-62 (D. Md. 2011).

Vaziri filed the Charge on October 27, 2015. Therefore, the Court may consider allegations that occurred within 300 days of October 27, 2015—that is, as of December 31, 2014. As such, Vaziri's allegations as to Cohen are time-barred. *See AMTRAK v. Morgan*, 536 U.S. 101, 113, 114 (2002) ("Discrete acts such as . . . refusal to hire are easy to identify," and "[t]he charge . . . must be filed within the . . . 300-day time period after the discrete discriminatory act occurred."); *see also Artis v. U.S. Food. Serv.*, JKB-13-2870, 2015 WL 1514021, at *3 (D. Md. Apr. 2, 2015), *aff'd*, 632 F. App'x 160 (4th Cir. 2016).

As to Henry and Archer, defendants argue that, by the time Preston made the hiring decisions to fill each position in early August 2015, "Vaziri was not meeting Preston's legitimate job expectations, as reflected in the 'Needs Improvement' rating in the annual performance evaluation that she received on September 4, 2015." ECF 36 at 6 (citing *Potts v. ADP, Inc.*, 47 F. Supp. 3d 361, 367 (W.D.N.C. 2014) ("[P]laintiff has not shown that she was equally or more qualified than the successful candidates for the positions. Indeed, at the time she applied for the position, plaintiff's job performance was deemed to be poor by her direct supervisor."), *aff'd*, 600 F. App'x 903 (4th Cir. 2015) (per curiam).

Indeed, Vaziri's 2015 Appraisal (ECF 24-5) demonstrates that her employer regarded her

performance as deficient at the time the hiring decisions were made. Plaintiff insists that the Appraisal suggests she was an "accomplished" employee. Specifically, she points out that Preston evaluated her "Work Standards" and "Accountability" as "Accomplished." ECF 24-5 at 8-9. However, a review of the entire Appraisal reveals that Vaziri received a "Needs Improvement Rating" in several categories, including "Functions: Plan," "Function: Professionalism," "Function: Customer Service," "Compassion," and "Respect." *See* ECF 24-5 at 1-8. And, her "Overall Rating" was "Needs Improvement." *Id*. at 10.

Plaintiff fails to proffer any basis that, at the time the hiring decisions were made, she met her employer's legitimate expectations as to performance. Moreover, there is no basis to show that age was the "but-for" cause of any challenged adverse employment action. *Gross*, 557 U.S. at 180; *see Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002). Indeed, an "employer has discretion to choose among equally qualified candidates provided the decision is not based upon lawful criteria." *Wileman v. Frank*, 979 F.2d 30, 38 (4th Cir. 1992).

With respect to Henry, Vaziri identifies one of defendants' legitimate non-discriminatory reasons as to why Henry was selected: in 2013 and 2014, Preston had worked with Henry at another hospital. ECF 28 at 3. Preston personally was familiar with Henry and "found [Henry] to be very organized, a team player, and well equipped with the people skills necessary to handle many types of stressful situations, both with patients and with other staff." ECF 36-13 ("Preston Supplemental Affidavit"); *see also Nhira v. Thompson Hospitality*, No. WMN-14-676, at *10 (D. Md. Sept. 8, 2016) (finding that comparator's "experience, reputation, and familiarity with the [relevant customer] account" was a legitimate, nondiscriminatory reason for salary disparity), *aff'd*, 680 F. App'x 228 (4th Cir. 2017); *Causey v. Balog*, 162 F.3d 795, 801 (4th Cir. 1998) ("While [plaintiff] may have been qualified to fill the . . . position, this Court is not in a position to second guess

executive hiring decisions that are based on legitimate, nondiscriminatory rationales such as superior administrative experience.").

In addition, the nursing supervisor position for which Archer was selected was part-time. ECF 36-13, ¶ 15; ECF 36-7 ("Archer Application"); ECF 36-8 (noting Archer filled the position on August 5, 2015). Vaziri, on the other hand, was interested exclusively in a full-time position. ECF 36-13, ¶ 15. When Vaziri asked Preston if she could transform the job into a full-time position, Preston said that she lacked the authority to do so. *Id.* As a result, Preston hired Archer. *Id.* ¶ 16.

For these reasons, summary judgment in favor of defendants is appropriate as to the ADEA claim.

### D.    Retaliation

Title VII prohibits an employer from retaliating against an employee who exercises her Title VII rights. 42 U.S.C. § 2000e-3(a); *see, e.g.*, *Ray v. Int'l Paper Co.*, 909 F.3d 661, 669 (4th Cir. 2018); *Netter v. Barnes*, 908 F.3d 932, 937 (4th Cir. 2018); *Okoli v. City of Balt.*, 648 F.3d 216, 223 (4th Cir. 2011). The purpose of Title VII's anti-retaliation provision is to preserve "unfettered access to statutory remedial mechanisms" for employees who fear reprisal. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997).

As noted, in order to establish a prima facie claim of retaliation under Title VII, "a plaintiff must show that (1) the plaintiff engaged in a protected activity, such as filing a complaint with the EEOC"; (2) the employer took an adverse action against the plaintiff; and (3) "'the protected activity was causally connected to the employer's adverse action.'" *Okoli*, 648 F.3d at 223 (citation omitted); *see Strothers*, 895 F.3d at 327; *Price v. Thompson*, 380 F.3d 209, 212 (4th Cir. 2004). As with a substantive discrimination claim, the *McDonnell Douglas* framework applies at

trial: "If a plaintiff 'puts forth sufficient evidence to establish a prima facie case of retaliation' and a defendant 'offers a non-discriminatory explanation' for [the adverse action], the plaintiff 'bears the burden of establishing that the employer's proffered explanation is pretext.'" *Hoyle*, *supra*, 650 F.3d at 337 (quoting *Yashenko v. Harrah's Casino*, 446 F.3d 541, 551 (4th Cir. 2006)).

A plaintiff must first establish that she engaged in protected activity. The Fourth Circuit has explained that, "in the context of a retaliation claim, a 'protected activity' may fall into two categories, opposition and participation." *Navy Federal Credit Union*, 424 F.3d at 406; *see Netter*, 908 F.3d at 937. "An employer may not retaliate against an employee for participating in an ongoing investigation or proceeding under Title VII, nor may the employer take adverse employment action against an employee for opposing discriminatory practices in the workplace." *Laughlin*, 149 F.3d at 259; *see* 42 U.S.C. § 2000e-3(a).

The plaintiff bears the burden of establishing that the alleged retaliation "would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar*, 570 U.S. at 360. But, the plaintiff may proceed either by direct evidence "or by proving that any non-retaliatory justification for the firing was pretextual." *Netter*, 908 F.3d at 938; *see Foster v. Univ. of Md. – E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015).

The second element of the prima facie case is an "adverse action." In *Strothers*, 895 F.3d at 327, the Fourth Circuit explained that an "adverse *employment* action" is not the standard in a retaliation case. (Emphasis added.) In other words, the adverse action "need not be employment or workplace-related in order to sustain a retaliation claim." *Id.* In a retaliation claim, the standard for an adverse action is more lenient than for a substantive discrimination claim. *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006) ("*Burlington Northern*") ("[T]he

antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment.").

In the retaliation context, a plaintiff must show that the challenged action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (quotation marks and citations omitted). Nonetheless, "[t]he anti-retaliation provision of Title VII does not protect against 'petty slights, minor annoyances, and simple lack of good manners.'" *Geist v. Gill/Kardash P'ship*, 671 F. Supp. 2d 729, 738 (D. Md. 2009) (quoting *Burlington Northern*, 548 U.S. at 68).

Moreover, Title VII's "antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington Northern*, 548 U.S. at 67. Even under the "lower bar" applicable to Title VII retaliation claims, the issuance of a personal improvement plan does not constitute adverse action. *Sillah v. Burwell*, 244 F. Supp. 3d 499, 517 (D. Md. 2017) (citing cases); *Wonasue v. Univ. of Md. Alumni Ass'n*, 984 F. Supp. 2d 480, 492 (D. Md. 2013); *Rock v. McHugh*, 819 F. Supp. 2d 456, 470-71 (D. Md. 2011).

To satisfy the third element—a causal connection between the protected activity and the adverse action—a plaintiff at trial must show that "the employer [took] the adverse employment action *because* the plaintiff engaged in a protected activity." *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) (emphasis in original). Ordinarily, there must exist "some degree of temporal proximity to suggest a causal connection." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 501 (4th Cir. 2005). Therefore, a "'lengthy time lapse between the [defendant's] becoming aware of the protected activity and the alleged adverse . . . action'" often "'negates any inference that a causal connection exists between the two.'" *Id.* (citation omitted). And, "a lapse of as little as two months between the protected

activity and an adverse employment action is 'sufficiently long so as to weaken significantly the inference of causation.'" *Clarke v. DynCorp Int'l LLC*, 962 F. Supp. 2d 781, 790 (D. Md. 2013) (quoting *King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003)). *See Price*, 380 F.3d at 213 (although period of nine to ten months between protected conduct and adverse action presented "a very close question," trier of fact could find causal connection where defendant declined to hire plaintiff "at the first available opportunity").

Nevertheless, mere temporal proximity is not necessarily enough to create a jury issue as to causation. "'Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.'" *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 309 (4th Cir. 2006) (citation omitted) (affirming summary judgment where the "actions that led to [plaintiff's] probation and termination began before her protected activity, belying the conclusion that a reasonable factfinder might find that [defendant's] activity was motivated by [plaintiff's] complaints"). And, pursuant to the Supreme Court's ruling in *Nassar*, 570 U.S. at 362, "a plaintiff making a retaliation claim under [Title VII] must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer."

In this case, plaintiff alleges that "on numerous occasions [she] reported wrongdoing." ECF 20, ¶ 2. She points to the employer's failure to assign any day-shift positions to her. And, she asserts that her termination in November 2015 followed a complaint she made in October 2015 as well as the filing of her EEOC Charge also in October 2015.

Vaziri does not specify the dates on which she applied for such positions, but she presumably refers to the positions filled by Archer and Henry. Defendants have proffered Vaziri's

applications for both positions, submitted by Vaziri on July 23, 2015 (ECF 36-6), and on July 24, 2015 (ECF 36-9), respectively.

As noted, on June 30, 2014, in an email to Hamner (ECF 28-4), Vaziri complained that Saunders "provoked" other employees against her. ECF 20, ¶ 5. However, this complaint is too remote in time to support a prima facie case of retaliation. *See Clarke*, *supra*, 962 F. Supp. 2d at 790 (noting that "a lapse of as little as two months between the protected activity and an adverse employment action is 'sufficiently long so as to weaken significantly the inference of causation'") (quoting *King*, 328 F.3d at 151 n.5).

On July 29, 2015, Vaziri reported "discrimination" to Dembeck, complaining that she "was applying constantly for different day positions" and "none was offered to [her]." ECF 28-17. Because Vaziri made this complaint after she already submitted her applications, it too cannot support her retaliation claim.

Vaziri also asserts that her poor performance evaluation in her 2015 Appraisal was a retaliatory response to her complaint to Limaj. ECF 28 at 12. In an email of September 4, 2015 (ECF 28-6) to Limaj, Vaziri complained that Saunders "did not approve me for any position which I applied." A few hours later, Preston met with Vaziri to go over her 2015 Appraisal (ECF 24-5), in which Vaziri received a "Needs Improvement" Rating. *See* ECF 36-13, ¶ 8. Over a month later, she was placed on the PIP. ECF 24-6.

Defendants contend that Vaziri "cannot base her retaliation claim on the negative performance evaluation she received on September 4, 2015." ECF 36 at 9. A poor performance evaluation "only become[s] an adverse action 'where the employer subsequently uses [it] as a basis to detrimentally alter the terms or conditions of the recipient's employment." *Smith v. Vilsack*,

832 F. Supp. 2d 573, 583 (D. Md. 2011) (quoting *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 377 (4th Cir. 2004)) (alteration in *Smith*).

Vaziri has not demonstrated a causal connection between her complaint to Limaj and the negative performance review she received. *See Strothers*, 895 F.3d at 336 ("[N]o causal connection can exist between an employee's protected activity and an employer's adverse action if the employer was unaware of the activity.") (citing *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998). As defendants point out, "Preston had already identified performance deficiencies by Vaziri long before the e-mail she . . . sent Limaj." ECF 36 at 10.

Vaziri's 2015 Appraisal led to the PIP. Thereafter, the employer was allegedly dissatisfied with Vaziri's performance under the PIP, and allegedly on this basis, Vaziri was terminated. Vaziri contends that defendants terminated her on November 11, 2015, in retaliation for her internal complaints and her EEOC Charge, filed on October 27, 2015. Based on the temporal proximity of these events, plaintiff maintains that there is a causal connection between the protected activity and her termination. *See Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994) ("This court found a causal connection between a plaintiff's protected activity and her discharge where the employer, with knowledge of a pending discrimination complaint, fired plaintiff approximately four months after the complaint was filed.") (citing *Williams*, 871 F.2d at 457).

In response, defendants argue that "it was Vaziri's failure to comply with the PIP that led to her termination." ECF 36 at 12. Further, they contend that Vaziri has not "identified any facts or evidence that the decisionmakers in this case were aware that she had filed an EEOC Charge." ECF 24-1 at 26. *See Strothers*, 895 F.3d at 336 ("An employer is aware of an employee's protected activity when he learns of an employee action that he understood or should have understood to be

opposition against a Title VII violation.") (citing *Burgess v. Bowen*, 466 F. App'x 272, 282 (4th Cir. 2012)).  And, both Preston and Dembeck maintain that, at the time they terminated Vaziri, they were not aware she had filed an EEOC Charge.  ECF 24-3, ¶ 22; ECF 24-10, ¶ 13.

To be sure, Vaziri has not presented any evidence to demonstrate that Preston, Dembeck or any other decisionmaker was put on notice of her Charge or her internal complaints.  But, in the posture of the case, she has not had an opportunity to conduct discovery, to which she is entitled.  Further, I cannot resolve the factual dispute as to the decisionmaker's knowledge of Vaziri's complaints or the filing of the Charge.  Nor can I determine whether the PIP, or the contention that Vaziri failed to comply with the PIP, amount to a pretext.

Summary judgment is premature as to the retaliation claim.  *McCray*, 741 F.3d at 484.

## V.        Conclusion

For the reasons set forth above, I shall deny defendants' Motion (ECF 24) as to plaintiff's retaliation claim, without prejudice, but grant the Motion as to all other claims.  An Order follows, consistent with this Memorandum Opinion.


Date:   February 8, 2019                                     _____/s/_____
                                                            Ellen L. Hollander
                                                            United States District Judge